# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

NISUS CORPORATION,      )
          )
     Plaintiff,      )
          )
v.           )    No.   3:03-CV-120
          )         (VARLAN/SHIRLEY)
PERMA-CHINK SYSTEMS, INC.,  )
          )
     Defendant.     )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This patent infringement action between plaintiff Nisus Corporation ("Nisus") and defendant Perma-Chink Systems, Inc. ("Perma-Chink") is before the Court for a decision on the merits following a seven-day bench trial that took place between June 1 and June 13, 2005. The parties waived their right to a jury trial. Nisus called seven witnesses in support of its case of patent infringement, while Perma-Chink cross-examined these witnesses in support of its defenses and counterclaims. By way of stipulation, the parties also submitted the deposition testimony of eighteen witnesses and numerous exhibits [*see* Doc. 413].

Following the trial, the parties filed proposed findings of fact and conclusions of law [*see* Docs. 406, 409], as well as timelines illustrating critical events [*see* Docs. 405, 408]. Perma-Chink has also filed a motion for closing argument [Doc. 411], but in light of the significant evidence and argument the Court has already heard, that motion will be denied.

Pursuant to Fed. R. Civ. P. 52(a), the Court sets forth herein its findings of fact and conclusions of law.

I.    **Findings of Fact**[1]

   A.    Parties

1.    In 1983, Richard Dunstan and Allan Dietrich formed Perma-Chink, which manufactures and sells a line of products for the log home industry. Mr. Dunstan provided the financial capital for the company, while Mr. Dietrich provided the product ideas. During the late 1980s, Mr. Dietrich and two Perma-Chink employees, Stanley Galyon and Vincent Palmere, invented a formulation for a product known as Bora-Care, which is a boron-based chemical preservative applied to wood timbers to prevent or eradicate insect infestations. The business relationship between Messrs. Dunstan and Dietrich deteriorated over time, however, and in 1990, Messrs. Dietrich, Galyon, and Palmere left Perma-Chink to form Nisus. As a result of this parting of ways, Nisus and Perma-Chink became competitors.

2.    Nisus, in which Mr. Dietrich retains an ownership interest, sells pesticides to the pest control market and is located in Knoxville, Tennessee. Nisus is the owner of United States Patent No. 6,426,095 B2 ("the '095 patent"), which involves "Methods and

---

[1] The Court only makes the findings of fact necessary to reach its conclusions of law, with an exception that is duly noted. Some of the facts and exhibits have been stipulated by the parties and will be considered accordingly [*see* Docs. 378, 388, 413].

Compositions For Retarding and Eradicating Infestation in Trees and Tree-Derived Products."

3.      Perma-Chink, in which Mr. Dunstan retains an ownership interest, sells a line of pesticide products for the log home industry. Perma-Chink has its manufacturing plant and primary sales office in Knoxville but also has sales offices in other locations.

   B.      Nisus's Claims Against Perma-Chink

4.      Since 1998, Nisus has initiated three patent infringement actions against Perma-Chink pursuant to 35 U.S.C. § 1 *et seq*. The instant action, known as Nisus II, was commenced on February 19, 2003. [*See* Doc. 1]. Nisus amended its complaint on November 18, 2003. [*See* Doc. 38]. The Court entered a final agreed pretrial order on June 2, 2005. [*See* Doc. 388].

5.      Nisus alleges that Perma-Chink advertised, used, and sold products known as Shell-Guard, Guardian, and Shell-Guard Ready-To-Use ("Shell-Guard RTU") that infringe the '095 patent, which is embodied in Nisus's Bora-Care product. Nisus seeks a permanent injunction and damages. [*See id*.].

6.      Nisus also alleges that Perma-Chink's products willfully infringe the '095 patent, entitling Nisus to treble damages. [*See id.*].

7.      In addition, Nisus contends that Perma-Chink's acts render this case exceptional under 35 U.S.C. § 285, entitling it to attorneys' fees and litigation costs. [*See id*.].

3

C.     Perma-Chink's Counterclaims Against Nisus

8.     Perma-Chink claims that Nisus breached its duty of candor, good faith, and honesty in dealing with the U.S. Patent and Trademark Office ("the PTO") when it failed to disclose, mischaracterized, or misrepresented related litigation and other material information. Perma-Chink contends Nisus's breach of its duty was intentional and willful.[2] [*See* Doc. 388].

9.     Perma-Chink contends the '095 patent is unenforceable, because Nisus breached its duty. Perma-Chink also contends the '095 patent is invalid, because Nisus's conduct was fraudulent.[3] [*See id.*].

---

[2] This inequitable conduct defense is the dispositive issue in this case. Perma-Chink also advances an additional theory of inequitable conduct and fraud premised on Nisus's introduction of "statements allegedly obtained from the '095 Patent Examiner some two-and-a-half years after the official '095 file history was officially closed." [Doc. 388 at 7]. Nisus had attempted to introduce the declaration of Daniel Pauly [Doc. 232, exh. 1 (subsequently withdrawn)], which contained alleged testimony from the Patent Examiner, but the United States filed a statement of interest urging the Court not to rely upon the declaration because the alleged testimony had been obtained in violation of federal regulations and controlling case law. [*See* Doc. 301]. During the trial, Nisus orally moved to preclude Perma-Chink from using or referring to the Pauly declaration, and the Court, relying on the United States' statement of interest and an independent determination that the declaration was irrelevant, granted the motion striking any reference to the Pauly declaration. Accordingly, the inequitable conduct and fraud defense premised on the Pauly declaration is not considered herein.

[3] Perma-Chink also advances an enablement argument, which is another invalidity defense, but the Court declines to consider this argument in light of its conclusions regarding inequitable conduct. *See Baxter Int'l v. McGaw, Inc.*, 149 F.3d 1321, 1332 (Fed. Cir. 1998) (noting defendant's argument that certain patents were invalid for anticipation was moot in light of holding that those patents were unenforceable due to inequitable conduct). For the same reason, the Court will also deny as moot Nisus's motion for summary judgment arguing non-invalidity based upon enablement [Doc. 259].

4

10. Perma-Chink also claims that Nisus misused the '095 patent against it, which renders the patent invalid. [*See id.*].

11. Perma-Chink claims Nisus engaged in anti-competitive behavior prohibited by antitrust law.[4] [*See id.*].

12. Perma-Chink claims that Nisus's conduct renders this case exceptional under 35 U.S.C. § 285, entitling Perma-Chink to recover its attorneys' fees and litigation costs. [*See id.*].

13. If Nisus's '095 patent is valid and enforceable, however, Perma-Chink stipulates that its Shell-Guard, Guardian, and Shell-Guard RTU formulations would infringe that patent. [*See* Doc. 378].

    D.    Patent Genealogy

14. On May 24, 1990, United States Patent Application No. 07/528,838 ("the '838 patent application") was filed by attorney Michael Teschner on behalf of Stanley Galyon, Vincent Palmere, and Allan Dietrich.

15. The '838 patent application claims a concentrate pesticide formulation with three components: at least one short chain polyalkylene glycol consisting of polyethylene glycol ("PEG"), at least one short chain alkylene glycol consisting of ethylene glycol

---

[4] Upon the parties' joint request, however, the Court has bifurcated Perma-Chink's antitrust counterclaims from the other claims and counterclaims. The antitrust counterclaims may be addressed following disposition of the other claims and counterclaims.

("EG"), and a glycol-soluble boron such as disodium octaborate tetrahydrate ("DOT").

16. Nisus's commercial embodiment of the inventions claimed in the '838 patent application is a product called Bora-Care. Bora-Care is a liquid concentrate substance that is diluted by the purchaser shortly before use with equal parts Bora-Care and water.

17. Several patents derive from the '838 patent application, including the following:

   a. United States Patent No. 5,104,664 ("the '664 patent"), which issued to Nisus on April 14, 1992;

   b. United States Patent No. 5,645,828 ("the '828 patent"), which issued to Nisus on July 8, 1997; and

   c. United States Patent No. No. 6,426,095 B2, which issued to Nisus on July 30, 2002, from United States Patent Application No. 09/888,875 ("the '875 patent application"). The '875 patent application was filed on June 25, 2001.

18. The '095 patent claims priority to the '838 patent application. Consequently, under 35 U.S.C. § 102(b) (the "on-sale bar"), the critical on-sale bar date for the '095 patent is May 24, 1989, one year prior to the filing of the '838 patent application.

   E.    Nisus I Litigation

19. On July 14, 1998, before the '095 patent had issued, Nisus commenced its first patent infringement action against Perma-Chink. *See Nisus Corp. v. Perma-Chink Sys., Inc.*, No. 3:98-CV-433 (E.D. Tenn.).   In that action, known as Nisus I, Nisus contended

6

that Perma-Chink's Shell-Guard and Guardian products infringed claims of the '664 and '828 patents. Almost three years after Nisus I was commenced, Nisus would voluntarily dismiss its allegations of infringement of the '664 patent, and Perma-Chink would file a motion for summary judgment alleging that the '828 patent was unenforceable pursuant to 35 U.S.C. § 102(b), because the product that embodied those patents was sold prior to the critical on-sale bar date.

20. On April 22, 1999, Mr. Teschner, who had handled the '838 patent application for Nisus, was admitted *pro hac vice* to represent Nisus in Nisus I.

21. On February 25, 2000, Allan Altera was admitted *pro hac vice* and substituted for Mr. Teschner as Nisus's counsel in Nisus I.

22. On August 23, 2000, during a deposition in Nisus I, Mr. Altera cross-examined Jeff Baden, a former Vice President of Marketing for Perma-Chink from fall 1989 to September 1990. Mr. Baden joined Nisus as Vice President of Marketing, where he was employed from September 1990 to March 1995. Mr. Baden testified that he had direct responsibility for marketing the new Bora-Care concentrate from late 1989 through March 1995, and he had access to all of the Bora-Care marketing material. Mr. Baden also stated that he had never heard of a Bora-Care ready-to-use ("RTU") product and had never seen any marketing materials for an earlier Bora-Care RTU formulation.[5]

---

[5] Whether witnesses in Nisus I believed the Bora-Care product was a "concentrate" or an "RTU" is significant, because Nisus, in prosecuting the '875 patent application before the PTO,

23.    On August 23, 2000, during another Nisus I deposition, Mr. Altera cross-examined

John Leeper, editor of the *Muir Log Home Annual Buyer's Guide* from 1988 to 1990.

During the deposition, Mr. Leeper identified the contract for the Bora-Care

advertisement "Rest Assured" and confirmed that it was executed in August 1988.

He also confirmed that the "Rest Assured" ad was published in the January-February

1989 issue of the *Muir Log Home Annual Buyer's Guide*.

24.    On August 25, 2000, during another Nisus I deposition, Mr. Altera cross-examined

Jeffery Liekhus, Perma-Chink's Marketing Manager from spring 1986 through May

5, 1989.  During the deposition, Mr. Liekhus testified to the following relevant facts:

a.    Bora-Care was developed as a concentrate in 1988.  Mr. Liekhus personally

developed a marketing brochure in the fall of 1988 for the new Bora-Care

concentrate.  In addition, he designed the product label for the new Bora-Care

concentrate, which included user application and mixing instructions as well

as safety information.

b.    He further testified he did not remember ever creating any marketing materials

for a Bora-Care RTU product.  Mr. Liekhus was aware of experimentation

---

would assert that there were two different formulations for the product Bora-Care.  Before the PTO,
Nisus attempted to distinguish between these two different formulas by calling the old formula a
"single glycol" and calling the new formula a "mixed glycol."  This distinction was significant,
because Nisus was attempting to argue to the PTO that the old, single glycol formula did not trigger
the on-sale bar that would prevent the PTO from issuing the '095 patent.  During discovery,
however, the old, single glycol formula was referred to as an RTU, because it was manufactured
with water, while the new, mixed glycol formula was referred to as a concentrate.  Thus, deposition
testimony indicating that a deponent believed he or she was using a concentrate Bora-Care product
might have undermined Nisus's assertions to the PTO about which formula triggered the on-sale bar.

with a Bora-Care RTU product, but testified that it "wouldn't stand up under testing," and therefore, Bora-Care RTU was never marketed in 1988.

c. He also created the "Rest Assured" ad, which Nisus has admitted was prepared for the Bora-Care product that embodied the claims in the original '838 patent application. Mr. Liekhus executed a contract for placement of the ad on August 31, 1988, in the 1989 *Muir Log Home Annual Buyer's Guide*.

25. During a May 8, 2001 deposition in Nisus I, Mr. Altera cross-examined Judy Gross, the co-owner of Log Connections, Inc. Log Connections, Inc. was a seller and distributor of the new Bora-Care concentrate beginning in the summer of 1988. During the deposition, Mrs. Gross produced contemporaneous Log Connections, Inc. business records that documented the sale of the new "Bora-Care" product during the summer and fall of 1988. Those business records were marked as exhibits two and three to her deposition. Mrs. Gross also testified that she was never informed of any Bora-Care RTU product. Furthermore, she used the new Bora-Care concentrate on her own log home in July 1988, and she and her husband prepared and submitted a "Testimonial Letter" dated November 15, 1988, regarding their use of the new Bora-Care concentrate on their home.

26. On May 8, 2001, Mr. Altera also cross-examined Mrs. Gross's husband, Michael Gross, co-owner of Log Connections, Inc. Mr. Gross testified that he and his wife had applied Bora-Care concentrate to their own log home during summer of 1988, and he was never informed of any Bora-Care RTU product.

9

27.     On May 17, 2001, Mr. Altera was present during, but did not participate in, the deposition of Dr. Lonnie Williams, a trial consultant for Nisus in Nisus I.[6]  Dr. Williams testified he used Bora-Care on test houses in Mississippi at the request of Perma-Chink in February 1989, and that his memory was that he always used a Bora-Care concentrate, not an RTU.  He testified further that, even though his recollection had always been that he had used a concentrate, Nisus's attorneys had recently shown him documents indicating that his "recollection must be wrong" and that he must have used an RTU.  Dr. Williams, however, had no personal knowledge whether those records were correct.

28.     As is evident from their deposition testimony, Messrs. Baden, Leeper, Liekhus, and Gross, as well as Mrs. Gross, were individual third-party witnesses directly involved in the use and/or sale of Nisus's Bora-Care product prior to May 24, 1989, the critical on-sale bar date for the patents issuing from the '838 patent application.  Their

---

[6] Nisus objects to Perma-Chink's introduction of the evidence contained in this finding of fact, which was produced during cross-examination of Mr. Altera, because it argues that such evidence is beyond the scope of Perma-Chink's claims contained in the pretrial order.  During the trial, the Court took such objections under advisement, but preliminarily instructed Perma-Chink to set forth some connection between the evidence it offers and its inequitable conduct allegations, although such an instruction did not limit Perma-Chink to only those factors specifically set forth in its amended answer or the pretrial order.  Having considered the objections following a thorough post-trial review of the evidence at issue, the Court permits Perma-Chink to introduce into evidence the proof forming the basis of this finding of fact.   In doing so, however, the Court notes that this finding of fact is not necessary to its conclusion in this case.  Instead, this finding of fact is merely additional proof that reinforces the Court's conclusions.  Therefore, this finding of fact is not relied upon in reaching the Court's judgment.

testimony consistently indicated that they were aware of and/or used a Bora-Care concentrate, not an RTU.

29.     On May 25, 2001, discovery closed in Nisus I.

30.     On June 13, 2001, Nisus voluntarily dismissed its '664 patent infringement allegations against Perma-Chink, because the '664 patent claims were limited to EG, not propylene glycol ("PG") – the glycol used in Perma-Chink's Shell Guard product.

31.     On July 2, 2001, Perma-Chink filed a motion for summary judgment arguing the remaining '828 patent was invalid under 35 U.S.C. § 102(b). Perma-Chink contended that Nisus had offered its Bora-Care invention for sale and/or sold it prior to the May 24, 1989 critical on-sale bar date. To support its allegations, Perma-Chink referred to third-party deposition testimony and business records, many of which were included in the 47 exhibits attached to its dispositive motion. Among the exhibits were the following:

a.      Financial statements showing Bora-Care sales in 1988;

b.      Contract for the "Rest Assured" ad executed in August 1988;

c.      A January 10, 1989 EPA Application for the Bora-Care label;

d.      Weekly Activity Summary reports of Bora-Care marketing and related correspondence;

e.      A Bora-Care testimonial letter from Michael and Judy Gross dated November 15, 1988;

11

f.      A Bora-Care testimonial letter from Mark Lukcik, a log home builder, dated November 16, 1988; and

g.      Deposition excerpts from Mrs. Gross, Mr. Gross, Mr. Galyon, Mr. Liekhus, Gary Schroeder, Vincent Palmere, and Bud Dietrich.

32.     On August 30, 2001, Perma-Chink sought to amend its answer in Nisus I to add specific counterclaims itemizing the alleged 1988 sales of the Bora-Care invention and asserting that Nisus had failed to disclose that sales information to the PTO during prosecution of the '664 and '828 patents. The accompanying draft amended answer and counterclaims alleged that Nisus's Bora-Care invention had been in public use and/or offered for sale prior to the critical on-sale bar date and that Nisus had failed to disclose that information to the PTO, rendering the patents unenforceable and/or invalid.

33.     On December 28, 2001, Mr. Altera, who earlier had replaced Mr. Teschner as Nisus's counsel in Nisus I, replaced Mr. Teschner as Nisus's counsel to prosecute the '875 patent application, which was pending before the PTO. As a result, Mr. Altera was simultaneously involved in litigating Nisus I and prosecuting the '875 patent application.

34.     On January 31, 2002, the Court, Hon. Curtis L. Collier, J., issued a memorandum opinion and order denying Perma-Chink's motion for summary judgment of invalidity in Nisus I. The Court determined that application of the doctrine of assignor estoppel precluded Perma-Chink from asserting any patent invalidity defense based upon facts

12

or conditions existing on or before September 13, 1990, because on that date

Perma-Chink had assigned its rights in '838 patent application to Nisus.[7]

35. In reaching its assignor estoppel conclusion in Nisus I, however, the Court found that

$6,700 worth of Bora-Care had been sold between July and November of 1988, which

was prior to the critical on-sale bar date of May 24, 1989. In making that finding, the

Court cited sales invoices, including some from Log Connections, Inc., as well as

Perma-Chink's sales records reflecting sales of Bora-Care from 1988.

36. On January 31, 2002, the Court also issued a separate memorandum and order

allowing Perma-Chink to amend its answer to assert that Nisus had committed

inequitable conduct rendering the '828 patent unenforceable, but the Court, relying

on assignor estoppel, barred Perma-Chink from asserting that Nisus had committed

---

[7] In the instant action, Nisus has relied on this conclusion from Nisus I to argue that Perma-Chink is estopped from challenging the validity or enforceability of the '095 patent. On March 31, 2005, the Court rejected Nisus's assignor estoppel argument by emphasizing the distinction between unenforceability and invalidity. [*See* Doc. 289]. Where assignor estoppel has foreclosed a claim of invalidity based on sales prior to the critical on-sale bar date, the facts surrounding such sales may still be considered to determine enforceability. [*See id.*]. Thus, the Court allowed Perma-Chink to present facts related to Nisus's sales prior to the critical on-sale bar date to establish unenforceability, but those facts could not be used to establish invalidity, because an invalidity claim had already been foreclosed by the Court's application of assignor estoppel in Nisus I. [*See id.*].

In the instant action, the issue is not whether Nisus's Bora-Care product sold prior to May 24, 1989, actually contained PG or EG, which would be important to determine validity of the '095 patent. Instead, the issue before the Court is whether Nisus engaged in inequitable conduct while prosecuting the '875 patent application, which goes to the enforceability of the '095 patent. To address the enforceability issue, however, the Court must consider some of the facts surrounding Nisus's Bora-Care product sales prior to May 24, 1989. Thus, in keeping with the Court's earlier ruling [*see* Doc. 289], consideration of those facts is limited to the question of enforceability and, specifically, Nisus's duty of candor, honesty, and good faith.

inequitable conduct based on Nisus's failure to disclose the Bora-Care sales prior to the critical on-sale bar date.

37.     On May 22, 2003, Nisus I was reassigned from Judge Collier to the undersigned.

38.     On September 30, 2003, the Court issued a memorandum opinion and order in Nisus I granting Perma-Chink's renewed motion for summary judgment of non-infringement,[8] holding that Shell-Guard and Guardian do not infringe any claims of the '828 patent.  As the Court explained in its memorandum opinion, it agreed with the Magistrate Judge's conclusion that Nisus was precluded from supplementing its expert proof after Judge Collier had earlier concluded that Nisus's proposed expert witness's testimony was unreliable.  As a result, there was insufficient evidence in the record from which a reasonable jury could find literal or equivalent infringement by Perma-Chink.

39.     On May 6, 2005, the U.S. Court of Appeals for the Federal Circuit affirmed without opinion the Court's January 31, 2002 and September 30, 2003 memorandum opinions

---

[8] Earlier, on May 20, 2002, Judge Collier had issued a memorandum opinion and order denying Perma-Chink's motion for summary judgment of non-infringement in Nisus I.  In that opinion, the Court had determined that, to the extent Perma-Chink was challenging the conclusions and methodology of Nisus's expert, Perma-Chink was highlighting facts about which there was a genuine issue of disputed material fact.  In reaching that determination, the Court indicated that if Nisus's expert testimony was shown to be unreliable under *Daubert*, the Court's conclusion might change.  On July 5, 2002, following a *Daubert* hearing, the Court agreed with the Magistrate Judge that the expert's methodology was unreliable under *Daubert*.  As a result, the testimony was excluded.  On July 19, 2002, Perma-Chink filed a renewed motion for summary judgment of non-infringement.

and orders. *See Nisus Corp. v. Perma-Chink Sys., Inc.*, 128 Fed.Appx. 156 (Fed. Cir. 2005).

F.    The '095 Patent File History

    i.    *Preliminary Amendment with '875 Patent Application*

40.    On June 25, 2001, shortly after Nisus had voluntarily dismissed its '664 patent infringement allegations against Perma-Chink because the '664 patent claims were limited to EG, Mr. Teschner filed a Preliminary Amendment with the '875 patent application that cancelled all 99 of the original claims pending from the '838 patent application and substituted 28 new claims in the '875 patent application. All of the new claims substituted PG for EG as the short chain alkylene glycol in the formulation of the invention.

41.    None of the original 99 claims in the '838 patent application filed in 1990 disclosed the use of PG as the short chain alkylene glycol. All of those claims covered EG as the short chain alkylene glycol in the formulation of the invention. In fact, the words "propylene glycol" appear only once – at claim 11 – in the 35,000 words of the original specification.

42.    Nisus could only claim priority for the inventions claimed in the '875 patent application by representing to the PTO that the new PG/PEG/DOT formulation had also been invented prior to May 24, 1990, which was the date of the filing of the '838 patent application.

43.    Nisus has always manufactured Bora-Care with EG. It has never manufactured any mixed glycol borate-based insecticide that uses PG as the short chain alkylene glycol component. Nisus has never sold a product that is a commercial embodiment of the '095 patent.

44.    Nisus substituted PG for EG in the '875 patent application to specifically cover Perma-Chink's product known as Shell-Guard, which was the only competitor to Nisus's Bora-Care at that time. During his trial testimony, Mr. Teschner states that he was "hoping" to file a second patent infringement lawsuit against Perma-Chink as soon as the '095 patent issued.[9]

45.    On December 3, 2001, the PTO rejected all pending claims in the '875 patent application, concluding that the claims were double patenting over the '664 patent.

46.    On December 28, 2001, shortly after the PTO's rejection, Mr. Altera replaced Mr. Teschner as counsel prosecuting the '875 patent application.

      ii.    *Meeting with Patent Examiner*

47.    On January 3, 2002, Mr. Altera met with Patent Examiner Carlos Azpuru at the PTO to discuss the '875 patent application. This meeting occurred approximately six months after Perma-Chink had filed its motion for summary judgment in Nisus I, including 47 exhibits, alleging invalidity based on Nisus's sales of Bora-Care prior

---

[9] Kevin Kirkland, president of Nisus, denies that the '875 patent application was filed in an attempt to target Perma-Chink's Shell-Guard and Guardian products. Nevertheless, the instant action was commenced February 19, 2003, approximately seven months after the '095 patent issued.

to the on-sale bar date. Mr. Altera's meeting with Patent Examiner Azpuru was also five months after Perma-Chink had sought leave to amend its answer in Nisus I to add specific counterclaims itemizing the alleged 1988 sales of the Bora-Care invention and asserting that Nisus had failed to disclose that sales information to the PTO during prosecution of the '664 and '828 patents.

48.     During his meeting with the Patent Examiner, Mr. Altera claims he distinguished between two different formulas for Bora-Care by calling the old formula a "single glycol" because it consisted of EG, Tim-Bor, and water. He called the new formula a "mixed glycol" because it consisted of PEG, EG, and DOT. This distinction was significant, because Mr. Altera was attempting to argue to the PTO that the single glycol formula did not trigger the on-sale bar that would prevent the PTO from issuing the '095 patent claiming the mixed glycol formula.

49.     Mr. Altera denies that he referred to the old formula as "ready-to-use" or "RTU." He also denies referring to the new formula as "concentrate." Throughout discovery in Nisus I, however, everyone involved, including Mr. Altera during deposition questioning of the third-party witnesses discussed earlier, referred to the old formula as an RTU, because it was manufactured with water. Likewise, everyone involved in Nisus I, including Mr. Altera during deposition questioning of those third-party witnesses discussed earlier, also referred to the new formula as a concentrate, because it required the customer to dilute the product with water.

50.     Stanley Galyon, one of the inventors of Bora-Care who first worked for Perma-Chink
        before moving to Nisus, testifies that he worked on an RTU version of Bora-Care for
        the majority of 1988.  After encountering stability problems with the RTU version,
        Galyon began working on a concentrate version of Bora-Care.  Galyon experimented
        with the RTU and the concentrate versions simultaneously.  The difference between
        the RTU and the concentrate products was that the RTU, which was already
        manufactured with water, had a lower level of concentrate and a higher amount of
        water or viscosity, and the concentrate product had a mixed glycol in it.

51.     According to Mr. Galyon, the concentrate version of Bora-Care containing the mixed
        glycol was finalized in late November or early December 1988.  Importantly,
        however, Galyon admits that it was possible that he finalized this version, which was
        the '095 patent formula, as early as September 1988 or at least in the fall of 1988.

52.     Patent Examiner Azpuru completed an official Interview Summary following his
        January 3, 2002 meeting with Mr. Altera.  The Interview Summary does not mention
        anything about the disclosure of litigation or litigation-related documents.

                iii.    *Information Disclosure Statement*

53.     On January 11, 2002, Nisus responded to the PTO's Office Action dated December
        28, 2001, with a written Information Disclosure Statement ("IDS") in which Nisus
        represented, among other things, that there were two different formulas used to
        produce two versions of the product known as Bora-Care.  First, there was an "old
        formula" consisting of EG, Tim-Bor, and water.  Second, there was a "new formula"

18

consisting of PEG, EG, and DOT. Nisus asserted that the "old formula" did not trigger the on-sale bar under 35 U.S.C. § 102(b), because it included water and no PEG.

54. Along with the IDS, Nisus also submitted a four-page Form 1449 that, among other things, included copies of the following: (1) batch tickets[10] numbered 1001-1010; (2) eight selected invoices; and (3) the "Rest Assured" advertisement from the *Muir Log Home Guide for Builders and Buyers*.

55. The eight selected invoices reflect Bora-Care sales in 1988 prior to the on-sale bar date. Seven of the eight invoices had been obtained by Perma-Chink from Log Connections, Inc., a third party, during discovery in Nisus I and were produced to Nisus during the litigation. The invoices were also included among the 47 exhibits to Perma-Chink's motion for summary judgment in Nisus I.

56. Nisus asserted that the invoices, which evidenced the sale of Bora-Care between July and November 1988, reflected sales of the "old formula," consisting of EG, Tim-Bor, and water, which was referred to as the "RTU" during Nisus I discovery. It further asserted that the "new formula," consisting of PEG, EG, and DOT, was not developed until "months after November 1988."

---

[10] Batch tickets are records of chemical formulas, or recipes, used when developing a chemical product. In this case, Stanley Galyon completed batch tickets to record the various formulations he tried while attempting to develop Bora-Care.

57.     Mr. Altera obtained the invoices and the advertisement from the exhibits attached to Perma-Chink's motion for summary judgment. As Mr. Altera has admitted, Perma-Chink had argued during Nisus I that these materials invalidated the '664 and '828 patents.

iv.     *'875 Patent Application Rejection*

58.     On February 20, 2002, the PTO issued an Office Action with a Final Rejection of all claims pending in the '875 patent application pursuant to 35 U.S.C. § 102(b), the on-sale bar. Patent Examiner Azpuru listed the eight invoices from 1988 as the basis for the on-sale bar date final rejection.

v.     *Meeting with Patent Examiner*

59.     On March 6, 2002, Mr. Altera again met with Patent Examiner Azpuru to discuss the '875 patent application. The primary topic for the interview was the on-sale bar rejection in the Office Action dated February 20, 2002, including all information regarding the invoices and the date that the Bora-Care invention had first been publicly used and/or offered for sale.

60.     During the March 6, 2002 meeting, Mr. Altera testifies that he explained to the Patent Examiner how the batch tickets, dated from June to November 1988, correlated temporally and directly with the eight invoices, thereby demonstrating that the Bora-Care sold in 1988 was for a single glycol formula, not a mixed glycol formula. The mixed glycol formula was the subject of the claims in the '875 patent application.

61. Although Mr. Galyon testifies that the batch tickets reflected the RTU version of Bora-Care, which did not contain a mixed glycol, he admits that it was possible that the concentrate version of Bora-Care, which did contain a mixed glycol, was finalized as early as September 1988, or at least in the fall of 1988.

62. Patent Examiner Azpuru completed an official Interview Summary following his March 6, 2002 meeting with Mr. Altera. Again, the Interview Summary did not mention anything about the disclosure of litigation or litigation-related documents.

      vi.    *Amendment After Final*

63. Following the March 6, 2002 interview, Nisus submitted a written Amendment After Final to the PTO dated March 6, 2002. Nisus included one additional invoice from the Nisus I litigation that was denominated as Exhibit D.

64. The other exhibits to the Amendment After Final (exhibits A, B, C, and E) were all copies of the eight invoices referenced by the Patent Examiner in the February 20, 2002 Office Action.

65. In the Amendment After Final, Nisus again asserted that the 1988 Bora-Care sales evidenced by the eight selected invoices and Exhibit D were for the "old Bora-Care composition," which referred to the single glycol, or RTU, formula.

66. On March 25, 2002, the PTO issued a Notice of Allowance for the '875 patent application. Nisus paid the issue fee on April 2, 2002. On July 30, 2002, the '875 patent application issued as the '095 patent.

G.  Nisus's Failures to Disclose

    i.  *Michael Teschner*

67.  Mr. Teschner is a patent attorney and partner with the law firm of Lerner, David, Littenberg, Krumholz & Mentlik in New Jersey. He has been registered to practice before the PTO since March 1988. During his career, he has drafted more than 100 patent applications and prosecuted more than 1000 patents. Mr. Teschner has worked as a patent attorney on behalf of both Nisus and Perma-Chink at different times.

68.  On May 24, 1990, Mr. Teschner filed the '838 patent application, from which the '664 and the '828 patents – the subjects of Nisus I – were derived. The '095 patent – the subject of the instant action – claims priority to the '838 patent application.

69.  On June 25, 2001, Mr. Teschner filed a Preliminary Amendment with the '875 patent application that cancelled all 99 of the original claims pending from the '838 patent application and substituted 28 new claims in the '875 patent application. All of the new claims substituted PG for EG as the short chain alkylene glycol in the formulation of the invention. Mr. Teschner took this action to target Perma-Chink's Shell Guard product, because he was "hoping" to file a second patent infringement lawsuit against Perma-Chink as soon as the '095 patent issued.

70.  Between July 1998 and December 2001, while he was prosecuting the '095 patent before the PTO, Mr. Teschner was aware of Nisus I. At no time during his prosecution of the '095 patent did Mr. Teschner disclose Nisus I or any litigation documents to the Patent Examiner. During this three-year, five-month period, Mr.

Teschner intentionally delayed disclosure of Nisus I to the PTO as part of Nisus's ongoing patent prosecution strategy.

71.     Mr. Teschner testifies that Nisus's delay in disclosing Nisus I was acceptable because the duty to disclose information material to patentability, 37 C.F.R. § 1.56 (known as Rule 56), is merely "advisory."

72.     According to Mr. Teschner's testimony, he interprets the law to require disclosure of related litigation and material litigation documents at some time "just during pendency" of the patent application but before the patent issues. "And as long as you don't let an application issue before the information is considered by the Patent Office, it's fine."

73.     Mr. Teschner acknowledges that there is an obligation to disclose allegations of inequitable conduct and prior public use and sale against an applicant, especially where there are ongoing co-pending applications between the same parties.

74.     Mr. Teschner explains that he was planning to disclose Nisus I and Nisus I-related litigation documents all at one time after discovery had closed. In order to permit discovery to close, Mr. Teschner allowed the '875 patent application to "tread water" by filing several continuing applications to keep the patent application alive.

75.     Although Mr. Teschner admits he never prosecuted an application that was related to ongoing litigation until the '875 patent application, he states that, based on his experience, the patent examiner would be annoyed if he received information in a "piecemeal" fashion before discovery closed.

76. Mr. Teschner attempts to excuse his failure to disclose Nisus I and Nisus I-related litigation documents to the PTO by asserting that he had been relieved of his patent prosecution responsibility just before discovery closed in Nisus I. Discovery in Nisus I closed on May 25, 2001, and Mr. Teschner was relieved of his '095 patent prosecution responsibilities on December 28, 2001, some seven months later.

77. Mr. Teschner claims he did not have any intent to mislead the PTO during his prosecution of the '095 patent when he filed the continuing applications or when he withheld information about Nisus I from the PTO. On the contrary, Mr. Teschner asserts that his intention was to provide the PTO with all of the information that it needed to determine whether the '095 patent should issue.

78. The Court finds Mr. Teschner's explanations of his intent in failing to disclose Nisus I and Nisus I-related documents are not credible.

   ii.   *Allan Altera*

79. Mr. Altera is a patent attorney who was licensed to practice before the PTO around 1995 or 1996. He was employed as an associate at the law firm Needle & Rosenberg for several years before joining the law firm Merchant & Gould in 2001. Both law firms are located in Atlanta, Georgia.

80. On February 25, 2000, Allan Altera was admitted *pro hac vice* and substituted for Mr. Teschner as Nisus's counsel in Nisus I.

81. Between August 23, 2000, and May 8, 2001, Mr. Altera conducted depositions in Nisus I in which he cross-examined Jeff Baden, John Leeper, Jeffery Liekhus, and

Michael and Judy Gross. Each deponent was a third-party witness directly involved in the use and/or sale of Nisus's Bora-Care product prior to May 24, 1989, the critical on-sale bar date for the patents sought in the '838 patent application.

82. On July 2, 2001, Perma-Chink filed its motion for summary judgment in Nisus I arguing the on-sale bar issue. To support its arguments, Perma-Chink referred to third-party deposition testimony and business records, many of which were included in the 47 exhibits attached to its dispositive motion. As counsel for Nisus, Mr. Altera was served with this motion, the accompanying memorandum, and the exhibits.

83. On August 30, 2001, Perma-Chink sought to amend its answer in Nisus I to add specific counterclaims itemizing the alleged 1988 sales of the Bora-Care invention and asserting that Nisus had failed to disclose that sales information to the PTO during prosecution of the '664 and '828 patents. As counsel for Nisus, Mr. Altera was served with this motion, the accompanying memorandum, and the draft amended answer and counterclaims.

84. On December 28, 2001, Mr. Altera replaced Mr. Teschner in prosecuting the '875 patent application. As a result, Mr. Altera was simultaneously involved in both litigating Nisus I and prosecuting the '875 patent application.

85. On January 3, 2002, Mr. Altera met with Patent Examiner Carlos Azpuru at the PTO to discuss the '875 patent application. Mr. Altera testifies that he disclosed the existence of the ongoing Nisus I litigation to Patent Examiner Azpuru during this

meeting. Patent Examiner Azpuru testifies[11] that Mr. Altera did not make any disclosure of Nisus I during the January 3, 2002 interview, and the written Interview Summary of that meeting makes no mention of the Nisus I litigation.

86.    Mr. Altera testifies that he did not supplement the January 3, 2002 written Interview Summary, because Patent Examiner Azpuru had checked a box indicating that the applicant need not provide a separate record of the substance of the interview, which Mr. Altera construed as indicating that Patent Examiner Azpuru was satisfied with his own summation of the interview. Patent Examiner Azpuru, however, testifies that he never instructed Mr. Altera "to not supplement the oral interview . . . if he found anything missing" from the Interview Summary.

87.    On January 11, 2002, Nisus submitted its IDS and the Form 1449 that included copies of batch tickets, eight selected invoices, and the "Rest Assured" advertisement from the *Muir Log Home Guide for Builders and Buyers*. Although the invoices and advertisement were obtained from the exhibits to Perma-Chink's motion for summary judgment in Nisus I, neither the IDS or Form 1449 mentions Nisus I or the source of the documents. Mr. Altera testifies that he told Patent Examiner Azpuru that the invoices and advertisement Nisus presented to the PTO on January 11, 2002, had

---

[11] Because patent examiners are considered quasi-judicial figures, it is rare for them to give testimony. Nevertheless, on February 23, 2005, the PTO issued a formal Grant Letter permitting Perma-Chink to conduct a deposition of Patent Examiner Azpuru. That deposition, which was videotaped and transcribed, took place on March 2, 2005. Because of the patent examiner's quasi-judicial role, the PTO carefully controlled the attorneys' lines of questioning. The Court has carefully reviewed the videotape deposition of Patent Examiner Azpuru.

originated from discovery in Nisus I, but Patent Examiner Azpuru's testimony directly contradicts Mr. Altera's claim.

88. On February 20, 2002, the PTO issued an Office Action with a Final Rejection of all claims pending in the '875 patent application pursuant to 35 U.S.C. § 102(b), the on-sale bar. Patent Examiner Azpuru listed the eight invoices from 1988 as the basis for the on-sale bar date final rejection. Nisus I was not mentioned.

89. On March 6, 2002, Mr. Altera again met with Patent Examiner Azpuru to discuss the '875 patent application. The primary topic for the interview was the on-sale bar rejection in the Office Action dated February 20, 2002. Mr. Altera testifies that he disclosed the existence of the ongoing Nisus I litigation to Patent Examiner Azpuru during this meeting. Patent Examiner Azpuru testifies that Mr. Altera did not make any disclosure of Nisus I during the March 6, 2002 interview, and the written Interview Summary of that meeting makes no mention of Nisus I.

90. Following the March 6, 2002 interview, Nisus submitted a written Amendment After Final to the PTO dated March 6, 2002. Nisus included one additional sales invoice that was denominated Exhibit D. Neither Nisus I or the source of the invoice were disclosed.

91. Patent Examiner Azpuru testifies that Nisus I was never disclosed to him at any time during the prosecution of the '875 patent application. During cross-examination by Nisus, Patent Examiner Azpuru reiterates and clarifies that Nisus I was not disclosed to him at any time prior to issuance of the '095 patent.

27

92.  Mr. Altera acknowledges that Nisus I was "related litigation" as defined by the PTO, and ultimately, Nisus had a duty to disclose it to the PTO, because Nisus I was material *per se* to the PTO's consideration of the '875 patent application.

93.  More specifically, Mr. Altera admits that it would have been "prudent to disclose all the material information, particularly the material information related to the [19]88 sales activity and the marketing activities in [19]89" to the Patent Examiner. Mr. Altera testifies that he submitted the "Rest Assured" ad, because it was a "potentially close call" with the Patent Examiner. Mr. Altera admits that he needed to disclose "all potential marketing materials" to the Patent Examiner. Mr. Altera testifies, however, that he intentionally failed to disclose the relevant deposition testimony of Messrs. Baden, Leeper, Liekhus, and Gross, as well as Mrs. Gross.

94.  Sometime after the '095 patent issued, Patent Examiner Azpuru testifies that Mr. Altera contacted him by telephone to inform him that there was litigation between Nisus and Perma-Chink. Patent Examiner Azpuru does not recall how long after the Notice of Allowance the litigation was disclosed. Further, he does not recall whether the litigation that was disclosed to him involved Nisus I or the instant action. Patent Examiner Azpuru also testifies that during this telephone call, Mr. Altera did not disclose that the previously submitted batch tickets, invoices, and advertisements dealing with the § 102(b) issue had been redacted[12] or produced in litigation. Mr.

---

[12] As will be more fully discussed, Nisus redacted certain documents prior to their submission to the PTO to remove, for example, Bates stamps and protective order designations, which would have identified their source or involvement in litigation.

Altera denies that this telephone call occurred and, in explaining the obvious contradiction, suggests that Patent Examiner Azpuru has a different recollection of events.

95.    In his testimony, Mr. Altera asserts alternatively that the PTO was put on notice of Nisus I by a notice sent by the Court to the PTO pursuant to 35 U.S.C. § 290.  Mr. Altera contends that such notice substituted for Nisus's duty to disclose the litigation. Patent Examiner Azpuru testifies that he never saw a § 290 notice regarding Nisus I, and there is no such notice in the '095 file history.  Even if such a notice was received by the PTO, Mr. Altera admits that he still had an obligation to disclose Nisus I to the PTO regardless of whether a § 290 notice was delivered.

96.    Regarding every key event, Mr. Altera's testimony, in which he claims he disclosed the existence of Nisus I to the PTO, is either uncorroborated or contradicted by Patent Examiner Azpuru.  After a thorough review of all the testimony, the Court finds that Patent Examiner Azpuru's testimony is corroborated and credible.  Accordingly, the Court finds that Nisus I was not disclosed to the PTO during pendency of the '875 patent application.

97.    Furthermore, Mr. Altera intentionally did not disclose the deposition testimony of Jeff Baden, John Leeper, Jeffery Liekhus, and Michael and Judy Gross, each of whom was directly involved in the use and/or sale of Nisus's Bora-Care product prior to the critical on-sale bar date.  Each deponent also testified that they were involved in the sale and/or use of a Bora-Care concentrate, which directly contradicted Nisus's

29

assertions to the PTO in its January 11, 2002 IDS and March 6, 2002 Amendment After Final.

98.     Mr. Altera intentionally did not disclose Perma-Chink's August 30, 2001 motion to amend its answer, the memorandum in support, or the accompanying draft amended answer and counterclaims, in which Perma-Chink alleged that Nisus's Bora-Care invention had been in public use and/or was offered for sale prior to the critical on-sale bar date and that Nisus had failed to disclose that information to the PTO, rendering the patents unenforceable and/or invalid. Mr. Altera testifies he did not disclose these documents because Nisus had previously filed a motion to strike, and the Magistrate Judge had indicated Perma-Chink's assertions were not "part of the case" until the motion was actually granted. When confronted with the requirements of MPEP § 2001.06(c) on cross-examination, Mr. Altera also claims that Nisus is only required to disclose its own assertions in litigation, not those of an opposing party, when they contradict an assertion before the PTO.

99.     Finally, Mr. Altera intentionally did not disclose certain exhibits to Perma-Chink's dispositive motion in Nisus I that supported Perma-Chink's contention that Nisus offered a Bora-Care concentrate for sale – or actually sold it – prior to the on-sale bar date. For example, Mr. Altera did not disclose financial statements showing Bora-Care sales in 1988, weekly activity summary reports of Bora-Care marketing and related correspondence, and testimonial letters, all of which were exhibits to Perma-Chink's motion for summary judgment.

30

### iii. *Redacted Documents*

100. The January 11, 2002 IDS and the Form 1449 submitted by Nisus to the PTO included copies of batch tickets, eight selected invoices, and the "Rest Assured" ad from the *Muir Log Home Guide for Builders and Buyers*. The Bates number stamps, reflecting that they were numbered for identification in litigation, had been redacted from the invoices and advertisement, and neither the IDS or Form 1449 mentions Nisus I or the source of the documents.

101. Nisus redacted the "ATTORNEYS EYES ONLY" and "CONFIDENTIAL" protective order designations and the Bates number stamps from the following Bates numbered documents before they were submitted to the PTO on January 11, 2002: N-010751, N-011043, N-010698, N-010693, N-010705, N-010814, N-010719-721, N-010715-716, and N-010707. In addition, Bates number stamps were redacted from the following additional eight documents consisting of 27 pages attached to the January 11, 2002 IDS and Form 1449: M0000219 and M0000222, N20186-204, LC000017, LC000018, LC000003, LC000009, LC000001, LC000010.

102. The March 6, 2002 Amendment After Final submitted by Nisus to the PTO included a Log Connections, Inc. invoice dated September 26, 1988, that was denominated "Exhibit D." The invoice was redacted to remove the Bates number stamp and deposition exhibit number.

103. All of the redacted documents submitted to the PTO were obtained by Nisus from the exhibits to Perma-Chink's motion for summary judgment in Nisus I, but neither Nisus

31

I or Perma-Chink's underlying motion and allegations were disclosed to the PTO. Perma-Chink's allegations in its dispositive motion cast doubt on Nisus's assertions to the PTO in the January 11, 2002 IDS and March 6, 2002 Amendment After Final.

104. Because he was Nisus's registered patent attorney responsible for Nisus I and prosecution of the '875 patent application, the Court finds that Mr. Altera is responsible for the redaction of the Bates stamp numbers.

H. Nisus's Misrepresentation to the PTO

105. When Nisus selected and disclosed to the PTO the eight Log Connections, Inc. invoices, Nisus repeatedly represented to the Examiner that the invoices represented the "old," single glycol formula, which included water and was an RTU.

106. The eight invoices were produced by Mr. and Mrs. Gross, co-owners of Log Connections, Inc., during their depositions. Mr. and Mrs. Gross each testified that the Bora-Care product referenced in the invoices was a concentrate that they themselves had used and sold.

107. Nisus's assertions to the PTO about the Log Connections, Inc. invoices were contradicted by the deposition testimony of Mr. and Mrs. Gross, the authors and custodians of the invoices.

108. Nisus's failure to disclose Mr. and Mrs. Gross's deposition testimonies about the invoices allowed the Patent Examiner to maintain an incorrect or misleading understanding of the contents of the invoices.

## II.     Conclusions of Law

### A.     Perma-Chink's Claim for Inequitable Conduct

Those involved in the filing and prosecution of a patent have "a duty to prosecute patent applications in the PTO with candor, good faith, and honesty." *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1109 (Fed. Cir. 2003). *See Li Second Family Limited P'ship v. Toshiba Corp.*, 231 F.3d 1373, 1378 (Fed. Cir. 2000). *See also* 37 C.F.R. § 1.56(a) (1996). The duty of candor includes a duty to disclose to the PTO any information that is material to the examination of the patent. *See Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1255 (Fed. Cir. 1997). *See also* 37 C.F.R. § 1.56; Manual of Patent Examining Procedure, ch. 2000 (8th ed., 2d rev. 2004) (hereinafter "MPEP")[13]; 3 Ernest Bainbridge Lipscomb III, *Lipscomb's Walker on Patents* § 9.51 (3d ed. Supp. 2003)[14]. The duty to disclose may be breached by affirmative misrepresentations of material facts, failure to disclose material information, or submission of false material information. *Li Second*, 213 F.3d at 1378.

A breach of the duty to disclose accompanied by an intent to deceive constitutes inequitable conduct. *See id.* (citing *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.

---

[13] The MPEP is not binding law, but it is entitled to judicial notice as the PTO's official interpretation of 37 C.F.R. § 1.56. *See Molins PLC v. Textron*, 48 F.3d 1172, 1180 n.10 (Fed. Cir. 1995); *ICU Medical, Inc. v. B. Braun Medical, Inc.*, No. C 01-3202 CRB, 2005 WL 588341, *13 (N.D. Cal. Mar. 14, 2005).

[14] In its opening statement, Nisus indicated that Mr. Lipscomb, a noted patent law expert, would be testifying on behalf of Nisus, along with Allan Dietrich, Nisus's president. However, neither Mr. Lipscomb or Mr. Dietrich testified.

33

Cir. 1995)).  For a court to conclude inequitable conduct occurred in a particular case, clear and convincing evidence must establish that "the alleged nondisclosure or misrepresentation occurred, that the nondisclosure or misrepresentation was material, and that the patent applicant acted with the intent to deceive the PTO."  *Id.* (citing *Glaxo, Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1048 (Fed. Cir. 1995)).

i.    *Nondisclosure and Misrepresentation*

The duty to disclose arises with the filing of an application and continues until that application is abandoned or a patent is granted.  *See* 37 C.F.R. § 1.56(a).  The duty to disclose is borne by "individuals associated with the filing or prosecution of a patent application," including the inventor of record, the attorney or agent who prepares or prosecutes the application, and "every other person substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application."  37 C.F.R. § 1.56(c).

All business conducted before the PTO must be transacted in writing.  37 C.F.R. § 1.2, *cited in Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1439 (Fed. Cir. 1984).  The PTO takes action "based exclusively on the written record in the Office."  37 C.F.R. § 1.2.  Accordingly, a disclosure is evidenced by some written record that the information has been conveyed to the examiner.  *See* MPEP §§ 713.04, 2002.02.

In the instant action, Nisus, as the '875 patent applicant, had a duty of disclosure.  Nisus's duty arose with the filing of the '875 patent application on June 25, 2001, and it

34

continued until the '095 patent was granted on July 30, 2002. Mr. Teschner bore the duty of disclosure while he acted as Nisus's patent prosecution counsel from June 25, 2001, when the application was filed, until December 28, 2001, when Mr. Altera substituted for Mr. Teschner as Nisus's patent prosecution counsel. At that time, Nisus's duty of disclosure passed to Mr. Altera, who became Nisus's patent prosecution counsel, and he retained the duty of disclosure until July 30, 2002, when the '095 patent was granted.

During the six-month period Mr. Teschner bore the duty of disclosure on behalf of Nisus, there is no written record that he disclosed Nisus I or any Nisus I-related documents to the Patent Examiner. Among the Nisus I litigation documents Mr. Teschner failed to disclose were depositions, or excerpts thereof, of Messrs. Baden, Leeper, Liekhus, and Gross, as well as Mrs. Gross. Mr. Teschner also failed to disclose certain exhibits to Perma-Chink's dispositive motion, including financial statements, the "Rest Assured" ad, weekly marketing activity summaries, testimonial letters, and the Log Connections, Inc. invoices. In short, Mr. Teschner, while offering explanations for his conduct, acknowledges that he intentionally did not disclose Nisus I or any Nisus I-related documents to the PTO.

During the seven-month period Mr. Altera bore the duty of disclosure on behalf of Nisus, there is no written record that he disclosed Nisus I to the PTO, and the Patent Examiner specifically testifies that Nisus I was not disclosed. *See Western Electric Co., Inc. v. Piezo Tech., Inc.*, 860 F.2d 428, 433 (Fed. Cir. 1988) (testimony of quasi-judicial government official entitled to great weight). There is also no record that Mr. Altera disclosed certain Nisus I-related documents. There is a written record, however, revealing

that Mr. Altera disclosed other Nisus I-related documents, but the source of those documents was not revealed to the PTO. Although Mr. Altera has asserted that the PTO was notified of Nisus I pursuant to 35 U.S.C. § 290, there is no evidence that such a notice was received, and Mr. Altera has acknowledged that such notice does not relieve him of the duty to disclose related litigation.

Mr. Altera intentionally failed to disclose the depositions of Messrs. Baden, Leeper, Liekhus, and Gross, as well as Mrs. Gross. He also intentionally did not disclose certain exhibits from Perma-Chink's dispositive motion, including financial statements, weekly marketing activity summaries, and testimonial letters. Mr. Altera disclosed batch tickets, the "Rest Assured" ad, and certain Log Connections, Inc. invoices, but he redacted the documents, which obscured the fact that they were exhibits in Nisus I. In short, Mr. Altera, while offering explanations for his conduct, acknowledges that he intentionally did not disclose Nisus I and certain Nisus I-related documents to the PTO.

In failing to disclose the deposition testimony of Mr. and Mrs. Gross, co-owners of Log Connections, Inc., Mr. Altera also caused a misinterpretation of the contents of the Log Connections, Inc. invoices. Even though Mr. and Mrs. Gross, who drafted the invoices, testified that they referred to a Bora-Care concentrate, Mr. Altera allowed the PTO to believe the invoices referred to a Bora-Care RTU. Mr. Altera's intentional failure to disclose the Gross's contradictory testimony caused the contents of the invoices to be misunderstood by the PTO.

The duty of disclosure, however, does not require that all information be disclosed; it only requires that all *material* information must be disclosed. *See Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 68 F. Supp. 2d 508, 551 (D.N.J. 1999). *See* 37 C.F.R. § 1.56. If the information is material, and an individual is aware of it, regardless of the source of that information, it must be disclosed to the PTO. *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d1370, 1383 (Fed. Cir. 2001). *See also* MPEP § 2001.04 ("duty applies to contemporaneously or presently known information").

Materiality is defined as follows:

> (b) . . . [I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
> > (1) it establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or
> > (2) it refutes, or is inconsistent with, a position the applicant takes in:
> > > (i) opposing an argument of unpatentability relied on by the Office, or
> > > (ii) asserting an argument of patentability.

37 C.F.R. § 1.56. Where there is a substantial likelihood that a reasonable examiner would have considered it important in deciding whether to issue the patent in question, the information is material. *See Dayco Prod., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1363 (Fed. Cir. 2003).

"Where the subject matter for which a patent is being sought is or has been involved in litigation, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the U.S. Patent and Trademark Office." MPEP

§ 2001.06(c). Accordingly, "related litigation" is *per se* material information covered by the duty of disclosure. *See Daimlerchrysler AG v. Feuling Advanced Tech., Inc.*, 276 F. Supp. 2d 1054, 1062-63 (S.D. Cal. 2003). The PTO has identified certain "related litigation" information that must be disclosed, including "allegations that are made of possible prior public use or sales, questions of inventorship, prior art, allegations of 'fraud,' 'inequitable conduct,' and 'violation of duty of disclosure.'" MPEP § 2001.06(c). In addition, "any assertion that is made during litigation which is contradictory to assertions made to the examiner," including assertions in any "pleadings, admissions, discovery including interrogatories, depositions, and other documents and testimony," must be disclosed. *Id.*

Finally, and of particular importance in this case, determinations of materiality that are "[c]lose cases should be resolved by disclosure, not unilaterally by the applicant." *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1076 (Fed. Cir. 1992). The PTO warns applicants against "making and relying on their own determinations of materiality" rather than disclosing all material information, because more disclosure "will result in a strengthened patent and will avoid later questions of materiality and intent to deceive." MPEP § 2001.04.

In the instant action, Messrs. Teschner and Altera, acting on behalf of Nisus, failed to disclose Nisus I to the PTO. As the MPEP makes clear, and as Mr. Altera acknowledges, Nisus I was related litigation, because the subject matter of the '875 patent application was involved. *See* MPEP § 2001.06(c). As such, Nisus I was, as Mr. Altera also acknowledges,

38

*per se* material information covered by the duty of disclosure. *See Daimlerchrysler*, 276 F. Supp. 2d at 1062-63.

Messrs. Teschner and Altera also failed to disclose Nisus I-related documents to the PTO. Although not every Nisus I-related document was material to the '075 patent application, Messrs. Teschner and Altera, acting on behalf of Nisus, failed to disclose documents that the PTO has specifically required applicants to disclose – namely, evidence of prior public use or sale and evidence inconsistent with Nisus's assertions regarding patentability. *See* 37 C.F.R. § 1.56(b); MPEP § 2001.06(c). The fact that the PTO specifically requires applicants to disclose such information indicates its very high degree of materiality to the determination of patentability.

Messrs. Teschner and Altera each acknowledge that applicants must disclose information about prior public use and sale, but each intentionally failed to disclose deposition testimony and litigation exhibits that suggested the subject matter of the '095 patent had been offered for public use or sale. In the case of Mr. Teschner, nothing regarding prior public use or sale was disclosed. In the case of Mr. Altera, only the advertisement, batch tickets, and certain sales invoices were disclosed, but only after they were redacted, which obscured their association to Nisus I.

Mr. Altera, in disclosing the batch tickets, advertisement, and certain sales invoices, asserted that there were two different Bora-Care formulas: one, a single glycol, that had been offered for public use or sale; and another, a mixed glycol, that was the subject of the '875 patent application. Mr. Altera never disclosed deposition testimony inconsistent with that

assertion, even though 37 C.F.R. § 1.56 (Rule 56) clearly requires such disclosure. *See* 37 C.F.R. § 1.56(b)(2); MPEP § 2001.06(c). Specifically, Mr. Altera failed to disclose the testimony of Messrs. Baden, Liekhus, and Gross, as well as Mrs. Gross, who did not recall using a Bora-Care RTU product, suggesting that the mixed glycol might have been offered for public use or sale.

Mr. Altera contends that such information need not be disclosed because it was uncorroborated legal interpretation, rather than corroborated facts. The information Mr. Altera failed to disclose, however, was plainly factual information and was not legal interpretation. With respect to the question of corroboration, the PTO does not distinguish between corroborated and uncorroborated facts, and the law does not modify the duty of disclosure or the test of materiality based upon whether the information is corroborated. *See* 37 C.F.R. § 1.56(b)(2); MPEP § 2001.06(c). *See also Krippelz v. Ford Motor Co.*, No. 98-C-2361, 2003 WL 21087109, at *4 to *5 (N.D. Ill. May 13, 2003) (finding no explicit limitation on term "all information"). In our patent system, it is for the Patent Examiner to determine whether the information is sufficient to refute an applicant's assertions of patentability, but the Examiner cannot do that when an applicant fails to disclose *all* the material information. *See LaBounty Mfg., Inc.*, 958 F.2d at 1076.

In short, a reasonable patent examiner would have considered the additional facts set forth in the Court's findings of fact to be important and material in deciding whether to allow the '875 patent application to issue as the '095 patent. *See Molins*, 48 F.3d at 1179.

### iii. *Intent*

Intent to deceive can be ascertained based upon the inference created by the totality of circumstances surrounding an applicant's conduct. *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1330 (Fed. Cir. 1998). "In determining whether an inference of intent can be drawn from circumstantial evidence, it is proper to consider the degree of materiality of the information." *Lipman v. Dickinson*, 174 F.3d 1363, 1370 (Fed. Cir. 1999). Where there is a high degree of materiality of the information that is the subject of the alleged nondisclosure or misrepresentation, less evidence of intent to deceive is required in order to conclude inequitable conduct has occurred. *Li Second*, 231 F.3d at 1378 (citing *N.V. Akzo v. E.I. DuPont de Nemours*, 810 F.2d 1148, 1153 (Fed. Cir. 1987)); *Critikon*, 120 F.3d at 1256. Intent to deceive may be "inferred where a patent applicant knew, or should have known, that withheld information would be material to the PTO's consideration of the patent application." *Critikon*, 120 F.3d at 1256; *Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1421 (Fed. Cir. 1988). As a consequence, merely denying intent to deceive will not prevent a court from finding such an intent. *FMC Corp. v. Manitowoc Co., Inc.*, 835 F.2d 1411, 1416 (Fed. Cir. 1987); *Gen. Elec. Music Corp. v. Samick Music Corp.*, 19 F.3d 1405, 1411 (Fed. Cir. 1994) ("[M]ere denials of intent to mislead may not be sufficient to overcome circumstantial evidence of intent to deceive."); *Argus Chem. Corp. v. Fibre Glass-Evercoat Co., Inc.*, 759 F.2d 10, 14 (Fed. Cir. 1985) ("Counsel's subjective 'good faith' does not, therefore, negate inequitable conduct.").

Mr. Teschner has attempted to explain his reason for failing to disclose the highly material related litigation information, but the Court has not found his explanations credible. Perhaps tellingly, however, Mr. Teschner states that he sought the '095 patent on behalf of Nisus because he was "hoping" to file a second lawsuit against Perma-Chink. That purpose for seeking the '095 patent, if true, could have been undermined if Mr. Teschner had disclosed the existence of Nisus I or Nisus I-related information, because the Patent Examiner might have rejected the '875 patent application, negating the possibility of a second lawsuit.

Mr. Altera did not disclose Nisus I to the PTO. Although he disclosed certain Nisus I-related documents to the PTO, the source of those document was not identified, because the Bates number stamps and/or protective order designations were redacted. He has acknowledged that he intentionally did not disclose certain deposition testimony and other documents related to Nisus's sales activity prior to the on-sale bar date, despite numerous opportunities to do so over a long period of time.

Given the totality of the circumstances, including the highly material nature of the information Nisus failed to disclose, the lack of credible explanations for the failures, the acknowledgment that the failures were intentional, and the ongoing pattern of failures, the Court can only conclude that Nisus possessed an intent to deceive the PTO when it failed to disclose Nisus I and Nisus-I related information, including evidence of Nisus's sales prior to the on-sale bar date and contradictions of Nisus's assertions to the PTO. *See Baxter Int'l,*

149 F.3d at 1330. *See also Semiconductor Energy Lab. Co., Ltd. v. Samsung Elect. Co., Ltd.*, 4 F. Supp. 2d 477, 498 (E.D. Va. 1998), *aff'd*, 204 F.3d 1368 (Fed. Cir. 2000).

iv.    *Inequitable Conduct*

To constitute inequitable conduct, the nondisclosure or misrepresentation must meet threshold levels of both materiality and intent. *Li Second*, 213 F.3d at 1378 (citing *Molins*, 48 F.3d at 1178). Once the threshold levels of materiality and intent are established, a court "must weigh materiality and intent to determine whether the equities warrant a conclusion that inequitable conduct occurred." *Li Second*, 213 F.3d at 1378 (citing *Glaxo*, 52 F.3d at 1048; *Molins*, 48 F.3d at 1178); *see also Critikon*, 120 F.3d at 1256.

In the instant action, the Court is presented with highly material information that was not disclosed to the PTO. The information was so highly material, in fact, that the PTO, through regulation and procedural rule, specifically requires the disclosure of such information. *See* 37 C.F.R. § 1.56(b); MPEP § 2001.06(c). Messrs. Teschner and Altera, acting on behalf of Nisus, failed to disclose ongoing litigation that raised questions about the patentability of the subject matter of the '875 patent application. In addition, Mr. Altera failed to disclose related litigation information that was inconsistent with Nisus's assertions of patentability.

As has been discussed, Nisus has acknowledged that the failures to disclose were intentional but has attempted to explain the conduct. Those explanations, however, are insufficient. Thus, the Court is presented with a pattern of intentional failures to disclose

43

highly material information over a significant period of time. From those facts, the Court can only conclude that Nisus possessed an intent to deceive the PTO.

Accordingly, in light of all the findings of fact and conclusions of law drawn herein, the Court finds that the equities warrant the conclusion that Nisus engaged in inequitable conduct. As demonstrated by a pattern of intentional failures to disclose highly material information to the PTO over a long period of time, clear and convincing evidence establishes that Nisus possessed an intent to deceive the PTO that resulted in a breach of its duty of candor, good faith, and honesty to the PTO. *Li Second*, 213 F.3d at 1378 (citing *Molins PLC*, 48 F.3d at 1178; *Glaxo, Inc.*, 52 F.3d at 1048). Accordingly, all claims in Nisus's '095 patent are unenforceable.

B.     Perma-Chink's Claim for Fraud

Fraud is distinguished from, and more serious than, inequitable conduct. *See, e.g., Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 882 F.2d 1556, 1563 (Fed. Cir.1989); *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1417-18 (Fed. Cir.1987); *Argus Chem. v. Fibre Glass-Evercoat Co., Inc.*, 812 F.2d 1381, 1384-85 (Fed. Cir. 1987); *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559 (Fed. Cir.1984). "Inequitable conduct in fact is a lesser offense than common law fraud, and includes types of conduct less serious than 'knowing and willful' fraud." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1069 (Fed. Cir. 1998).

> [T]he concept of 'fraud' has most often been used by the courts, in general, to refer to a type of conduct so reprehensible that it could alone form the basis of an actionable wrong (*e.g.*, the common law action for deceit). That narrow

44

range of conduct, now frequently referred to as 'technical' or 'affirmative' fraud, is looked upon by the law as quite serious. Because severe penalties are usually meted out to the party found guilty of such conduct, technical fraud is generally held not to exist unless the following indispensable elements are found to be present: (1) a representation of a material fact, (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived as a result of his reliance on the misrepresentation.

*Norton v. Curtiss*, 433 F.2d 779, 792-93 (C.C.P.A. 1970) (citing W. Prosser, *Law of Torts* §§ 100-05 (3d ed. 1964); 37 C.J.S. *Fraud* § 3 (1943)). In attempting to determine whether inequitable conduct also satisfies the elements of fraud, "the courts appear to look at the equities of the particular case and determine whether the conduct before them . . . was still so reprehensible as to justify the court's refusing to enforce the rights of the party guilty of such conduct." *Id*. at 793.

In the instant action, although Nisus engaged in inequitable conduct, its conduct was not "so reprehensible that it could alone form the basis of an actionable wrong." *See Norton*, 433 F.2d at 792. Nisus's inequitable conduct consisted of a pattern of intentional failures to disclose material information to the PTO by Messrs. Teschner and Altera. Messrs. Teschner and Altera, however, did not affirmatively represent to the PTO that there was no related litigation. Instead, they failed to disclose the related litigation, which does not rise to the level of "'affirmative' fraud." *See id.* The difference between the failure to disclose material information and an affirmative misrepresentation of material information is the difference between inequitable conduct and fraud in this case.

45

C.    Perma-Chink's Claim for Attorneys' Fees and Litigation Costs

In exceptional cases, the Court is authorized to award reasonable attorney fees to the prevailing party. *See* 35 U.S.C. § 285. An award of attorneys' fees is intended to prevent gross injustice and requires an unambiguous showing of extraordinary misconduct, fraud, or lack of good faith. *See Arbrook, Inc., v. Am. Hosp. Supply Corp.*, 645 F.2d 273 (5th Cir. 1981). Thus, where, in exercising its discretion, a court finds unfairness or bad faith in the losing party's conduct or some other equitable consideration of similar force, fees and costs may be awarded. *See Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368 (Fed. Cir. 2005). To make that determination, a court must consider two factors: first, whether the prevailing party has proven the case is exceptional by clear and convincing evidence, and second, whether an award would be appropriate. *See id.*

In the instant action, the Court is unable to conclude that Perma-Chink has established by clear and convincing evidence that Nisus engaged in extraordinary misconduct, fraud, or bad faith. Although it engaged in inequitable conduct by intentionally breaching its duty of disclosure, the Court has already concluded that Nisus's misconduct did not rise to the level of fraud. For those same reasons, the Court, in exercising its discretion, concludes that an award of attorneys' fees and litigation costs to Perma-Chink would not be appropriate in this case.[15]

---

[15] This case, like Nisus I, has been fiercely litigated by both parties. As a review of the pleadings illustrates, the parties have traded barbs and accusations that evidence an unusual level of bitterness reminiscent of the fictional Montagues and Capulets or the real-life Hatfields and McCoys. *See* William Shakespeare, *Romeo & Juliet*; Normal Lugar, *Hatfield-McCoy Feud –*

D.    Nisus's Claims Against Perma-Chink

Because the '095 patent is unenforceable, Nisus's motion for summary judgment of infringement by Perma-Chink's Guardian product [Doc. 258] will be denied as moot. Likewise, Nisus's motion for summary judgment of non-validity based on enablement [Doc. 259] will be denied as moot. Nisus's request for attorneys' fees and litigation costs also will be denied as moot. Because Nisus committed inequitable conduct rendering the '095 patent unenforceable, its objections pursuant to Rule 72 to the Magistrate Judge's *Markman* Report and Recommendation [Doc. 252] will be denied as moot. Because the claim construction issues raised in Nisus's *Markman* objections are no longer viable in light of the Court's conclusions, the Court is not required to accept or reject the Report and Recommendation [Doc. 244] filed by United States Magistrate Judge C. Clifford Shirley, Jr. *See Baxter Int'l v. McGaw, Inc.*, 149 F.3d 1321, 1334 (Fed. Cir. 1998) (upon finding patents unenforceable based on inequitable conduct, it is unnecessary to address parties' respective claim construction arguments).

*Roseanna: Juliet of the Mountains*, Blue Ridge Country (Mar./Apr. 1996). In light of the parties' fierce defense of their respective interests, however, the Court cannot conclude that one party or another has suffered gross injustice. *See Arbrook, Inc.*, 645 F.2d at 279 (citations omitted) ("The purpose of § 285 is to prevent gross injustice, and an award under that statute requires an unambiguous showing of extraordinary misconduct."). Instead, the parties' long and bitter feud appears to have been a fulfillment of Mercutio's curse of the rival families in Shakespeare's *Romeo & Juliet*. *See Romeo & Juliet*, act. 3, sc. 1 (Oxford ed. 1914).

## III.    Conclusion

In summary, the Court finds by clear and convincing evidence that Nisus failed to disclose Nisus I and Nisus I-related litigation documents to the PTO.  That information involved related litigation, which was highly material to the patentability of the '875 patent application, because it implicated the on-sale bar and contradicted Nisus's assertions to the PTO.  Nisus possessed an intent to deceive when it failed to disclose the highly material information to the PTO.  Consequently, Nisus committed inequitable conduct during its prosecution of the '875 patent application.

Based on the foregoing findings of fact and conclusions of law, the Court will find in favor of Perma-Chink.  Accordingly, all claims of the '095 patent will be adjudged unenforceable.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE